IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 18, 2000 Session

## JUDY DIANE PENNINGTON v. FRANK RAY PENNINGTON

**Direct Appeal from the Chancery Court for Madison County**
**No. 55803; The Honorable Joe C. Morris, Chancellor**

_____

**No. W2000-00568-COA-R3-CV - March 14, 2001**

_____

This appeal arises from a divorce proceeding. The Chancery Court of Madison County granted the Appellee a divorce on the grounds of inappropriate marital conduct and adultery. The trial court calculated child support based on the Appellant's average income prior to his first incarceration. In lieu of child support payments, the trial court awarded the Appellee an office building titled solely in her name. The trial court also awarded the Appellee $5,000.00 as alimony in solido to help defray her attorney's fees and expenses but declined to award periodic or rehabilitative alimony due to the trial court's division of marital property.

The Appellant appeals the trial court's calculation of child support as well as the award of the office building to the Appellee in lieu of child support and alimony. For the reasons stated herein, we reverse and remand in part, and we remand in part for further findings of fact.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY KIRBY LILLARD, J., joined.

Carthel L. Smith, Jr., for Appellant

James F. Butler, Lisa A. Houston, for Appellee

**OPINION**

### I. Facts and Procedural History

The Appellant, Frank Ray Pennington ("Mr. Pennington"), and the Appellee, Judy Diane Pennington ("Ms. Pennington"), were married for twenty-four years and have three children ages

eighteen, seventeen, and fifteen.[1]  Ms. Pennington filed a Complaint for Divorce in the Chancery Court of Madison County on February 17, 1999.  The parties stipulated at trial that Ms. Pennington was entitled to a divorce and custody of the children.

Mr. Pennington is currently incarcerated following his latest drug-related conviction.  Mr. Pennington was convicted for writing prescriptions for controlled substances and was sentenced to prison in October 1994.  In January 1996, Mr. Pennington was released from prison, and he served the remainder of his sentence in a halfway house until April or May 1996.  In September 1997, Mr. Pennington was arrested for possession of cocaine.  After pleading guilty, he paid a fine and attended a drug class.  Mr. Pennington was again arrested in June 1998 for possession of cocaine and is currently serving his prison sentence.  After serving his prison sentence, Mr. Pennington will participate in a drug program followed by a stay in a halfway house.  Mr. Pennington expects to be released in the fall of 2001.

Mr. Pennington was an ear, nose, and throat specialist.  His medical license was revoked in November 1999 following his latest conviction.[2]  For the five years preceding his first arrest in 1993, Mr. Pennington's average income was $226,956.00.  Ms. Pennington is employed as a lab technician with Jackson-Madison County Hospital and makes approximately $30,000.00 per year.

The only property at issue before the trial court was a commercial office building from which Mr. Pennington ran his medical practice.  In July 1998, Mr. Pennington transferred the office building to Ms. Pennington by quitclaim deed.[3]  Mr. Pennington transferred the office building to Ms. Pennington to protect the property from any fines or confiscations by the federal government as well as for liability purposes if he was to be sued.  Ms. Pennington leased the office building in August, 1998.  The lease agreement lists both Mr. Pennington and Ms. Pennington as lessors, but the agreement is signed solely by Ms. Pennington.[4]  Ms. Pennington has received all rental income from the office building, and she is responsible for all maintenance and oversight.  At the trial, Ms. Pennington stated that the office building was marital property and requested that the trial court award her the office building in lieu of child support and alimony.

On February 14, 2000, the trial court entered a Final Decree of Divorce on the grounds of inappropriate marital conduct and adultery.  The trial court divided the marital property as follows:

---

[1]At the time of entry of the Final Decree of Divorce, the parties' children were all minors ages seventeen, fifteen, and fourteen.

[2]Mr. Pennington will attempt to regain his medical license after serving his sentence for possession of cocaine.

[3]The quitclaim deed was not presented before the trial court nor is it a part of the record.

[4]Ms. Pennington also signed the lease agreement on behalf of Mr. Pennington.

<u>Ms. Pennington</u>

| Item | Value | Debt | Net Value |
|---|---|---|---|
| (1) House and Lot | $180,000.00 | -0- | $180,000.00 |
| (2) Office Building | $435,000.00 | $145,878.00 | $289,122.00 |
| (3) 1996 Chevrolet Lumina | $9,000.00 | -0- | $9,000.00 |
| (4) 1990 Jeep Cherokee | $3,000.00 | -0- | $3,000.00 |
| (5) 1995 Jeep Wrangler | $8,000.00 | -0- | $8,000.00 |
| (6) Furniture & Household Goods | $13,000.00 | -0- | $13,000.00 |
| (7) 35 Shares Westin Hotel Stock | $35,000.00 | -0- | $35,000.00 |
| (8) Securities America Account | $9,000.00 | -0- | $9,000.00 |
| | TOTAL FOR MS. PENNINGTON: | | $546,122.00 |

<u>Mr. Pennington</u>

| Item | Value | Debt | Net Value |
|---|---|---|---|
| (1) Medical Equipment & Furniture | $20,000.00 | -0- | $20,000.00 |
| (2) X-ray Equipment | $15,000.00 | -0- | $15,000.00 |
| (3) Securities America Account | $256,000.00– $296,528.00 | -0- | $256,000.00– $296,528.00 |
| | TOTAL FOR MR. PENNINGTON: | | $291,000.00– $331,528.00[5] |

In dividing the marital assets, the trial court took into account testimony at the hearing and Mr. Pennington's dissipation of assets.[6] Ms. Pennington was also awarded the tax exemption for the children and two insurance policies owned by Mr. Pennington with face amounts totaling $350,000.00. The trial court ordered Ms. Pennington to continue furnishing medical insurance for the children and ordered Mr. Pennington to pay two credit card debts totaling $14, 200.00. Mr. Pennington was awarded his separate property. The trial court found that Ms. Pennington had no separate property.

In accordance with the child support guidelines, the trial court calculated the total child support until all the children reach the age of majority to be $209,136.00. The trial court based this

---

[5]There was disagreement at the trial as to the correct amount of the Securities America account. Mr. Pennington's attorney stated that the amount was approximately $256,000.00. Ms. Pennington's attorney stated that the amount was approximately $296,000.00. The trial court authorized Mr. Pennington's attorney to submit a late exhibit providing the correct value as of the date of trial. We can find no such exhibit in the record.

[6]The trial court cited the following as examples of Mr. Pennington's dissipation of assets: (1) $3,200 in attorney's fees for one of the women with whom Mr. Pennington was having an affair, and (2) thousands of dollars in attorney's fees for Mr. Pennington's various legal infractions.

amount on Mr. Pennington's income earning capacity, utilizing his prior average earnings of $226,956.00. In lieu of child support, the trial court awarded Ms. Pennington a larger share of the marital property, the office building, so that she may use the property for the purpose of child support. The trial court also awarded Ms. Pennington $5,000.00 as alimony in solido to help defray her attorney's fees and expenses related to the suit; however, the trial court stated that it would not award periodic or rehabilitative alimony after taking into consideration the division of marital property. This appeal followed.

## II. Standard of Review

In this non-jury case, our review is *de novo* upon the record with a presumption of the correctness of the trial court's findings of fact unless the preponderance of the evidence is otherwise. See Tenn. R. App. P. 13(d); No presumption of correctness attaches to the lower court's conclusions of law. See Jahn v. Jahn, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

## III. Law and Analysis

There are two issues presented for our review: (1) whether the trial court erred in making its computation of child support, or more specifically, by failing to make a finding that Mr. Pennington was willfully and voluntarily unemployed prior to imputing income; and (2) whether the trial court erred in awarding Ms. Pennington marital property in lieu of child support and alimony. We examine each of these issues in turn.

In determining child support, courts must apply as a rebuttable presumption the child support guidelines promulgated by the Tennessee Department of Human Services. See Tenn. Code Ann. § 36-5-101(e)(1) (1996). Under the child support guidelines, the amount of child support is calculated based on a percentage of the obligor's net income. See Tenn. Comp. R. & Regs. ch. 1240-2-4-.03 (1994). In certain cases, however, the court must compute child support based on a percentage of the obligor's potential income rather than net income. See Brooks v. Brooks, 992 S.W.2d 403, 407 (Tenn. 1999). "If an obligor is willfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience." Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(d).

In order for the trial court to compute child support based on the obligor's potential income, the court must make a threshold finding that the obligor was willfully and voluntarily unemployed or underemployed. See Marcus v. Marcus, No. 02A01-9611-CV- 00286, 1998 WL 29645, at *3 (Tenn. Ct. App. Jan. 28, 1998). There may be an implicit finding of willful and voluntary unemployment or underemployment on the basis of the trial court's ultimate decision. See Ralston v. Ralston, No. 01A01-9804-CV-00222, 1999 WL 562719, at *n.7 (Tenn. Ct. App. Aug. 3, 1999) (citing Hyden v. Hyden, No.02A01-9611-CH-00273, 1997 WL 593800, at *3 (Tenn. Ct. App. Sept. 25, 1997)).

In the case at hand, the trial court calculated child support "based on Doctor Pennington's earnings in an earlier period, before he became incarcerated, on the grounds that he's capable of making the kind of money and has made that kind of money and is in a position to pay the child support according to his ability." The trial court calculated child support based on Mr. Pennington's potential income but failed to find whether he was willfully and voluntarily unemployed. Where a trial court finds that an obligor was willfully and voluntarily unemployed or underemployed, we review that decision with a presumption of correctness unless the preponderance of the evidence is otherwise. Where, however, the trial court does not make a specific finding of willful and voluntary unemployment or underemployment, we may review the record and determine the issue. See id. at *7.

The determination of whether an obligor is willfully and voluntarily unemployed or underemployed is dependent upon the factual background of the case. See id. at *3. Willful and voluntary unemployment or underemployment does not occur solely in cases where the obligor becomes unemployed or underemployed with the intent to avoid child support obligations. See Garfinkel v. Garfinkel, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996) (citing Ford v. Ford, No. 02A01-9507-CH-00153, 1996 WL 560258, at *1 (Tenn. Ct. App. Oct. 3, 1996)). Cases differ as to whether an obligor is willfully and voluntarily unemployed or underemployed. See Brooks v. Brooks, 992 S.W.2d 403, 407 (Tenn. 1999) (finding than an obligor who sold his successful business and began a cattle breeding operation was willfully and voluntarily underemployed); Marcus v. Marcus, No. 02A01-9611-CV- 00286, 1998 WL 29645, at *1 (Tenn. Ct. App. Jan. 28, 1998) (finding that an obligor who was terminated from his job and started an internet business was not willfully and voluntarily underemployed); Garfinkel, 945 S.W.2d at 748 (finding that an obligor who quit his job in physics to live off income from rental properties was willfully and voluntarily underemployed).

In Wilson v. Wilson, No. M1999-02045-COA-R3-CV, 2000 WL 1050625, at *1 (Tenn. Ct. App. July 31, 2000), Mr. Wilson was a business manager of a car dealership who was fired from his job after accusations that he sold extended warranties to customers and failed to tender the proceeds to the dealership. See id. Mr. Wilson took a job with another car dealership making less than half of the salary per month he made as a business manager. See id. The trial court denied Mr. Wilson's request for a termination or reduction in child support payments, finding that he was "the maker of his own financial troubles as a result of his dishonest actions at his former place of employment." Id. The court of appeals reversed. "[W]illful or voluntary unemployment or underemployment must result from an intent on the part of the parent to reduce or terminate his or her income." Id. at *2. Because Mr. Wilson did not intend to lose his job when he committed the criminal acts, the court of appeals found that the record did not support a finding that Mr. Wilson was willfully or voluntarily unemployed or underemployed. See id.

The case at hand is analogous to Wilson. In Wilson, Ms. Wilson argued that because Mr. Wilson's criminal acts were willful and voluntary, he was willfully and voluntarily underemployed. Likewise, in the case at hand, Ms. Pennington asserts that because Mr. Pennington's criminal act, using cocaine, was willful and voluntary, and because this act led to his incarceration and resulting unemployment, he was willfully and voluntarily unemployed. We decline to make this conclusion.

Mr. Pennington did not intend to become incarcerated and unemployed when he made the choice to use cocaine; thus, the record does not support a finding that Mr. Pennington was willfully and voluntarily unemployed. Consequently, the trial court's award of child support based on Mr. Pennington's potential income rather than his net income is reversed. We remand this case to the trial court for a determination of Mr. Pennington's net income and to make an award of child support based on Mr. Pennington's net income.

The next issue presented for our review is whether the trial court erred in awarding Ms. Pennington marital property, the office building, in lieu of child support and alimony.[7] Because the trial court's award of child support based on Mr. Pennington's net income may affect the trial court's award of the office building, we conclude that it is inappropriate to address this issue at this time.

We do take issue, however, with the trial court's distribution of the office building as marital property. At trial, Ms. Pennington testified that the office building was titled solely in her name by quitclaim deed from Mr. Pennington. She also testified that she receives all rental income from the office building, and she is solely responsible for the maintenance and oversight of the office building. Though both Mr. Pennington and Ms. Pennington appear as lessors on the lease, Ms. Pennington signed the lease on his behalf.

When dividing property between divorcing parties, the trial court must first classify the property as marital or separate. See Batson v. Batson, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). Once classified, the trial court must give each party their separate property and then equitably divide the marital property between the parties. See id. Section 36-4-121(b)(2) of the Tennessee Code defines separate property as

> all real and personal property owned by a spouse before marriage;
> property acquired in exchange for property acquired before marriage;
> income from and appreciation of property owned by a spouse before
> marriage except when characterized as marital property under
> subdivision (b)(1); and property acquired by a spouse at any time by
> a gift, bequest, devise or descent.

Tenn. Code Ann. § 36-4-121(b)(2) (1996). This section has been construed to mean that "gifts by one spouse to another of property that would otherwise be classified as marital property are the separate property of the recipient spouse." Batson, 769 S.W.2d at 856.

To be valid, a gift requires (1) donor's intent to make a gift; and (2) surrender of dominion and control by the donor over the property. See Hansel v. Hansel, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996). A conveyance of property between spouses creates a rebuttable presumption of a gift,

---

[7]The trial court did not state that it was awarding the office building in lieu of alimony. Rather, the trial court stated that it would not award periodic or rehabilitative alimony after taking into consideration the division of marital property.

but this is not conclusive evidence on the issue. <u>See Turner v. Turner</u>, No. M1999-00482-COA-R3-CV, 2000 WL 1425285, at *7 (Tenn. Ct. App. Sept. 28, 2000).

In <u>Denton v. Denton</u>, No. E1999-02713-COA-R3-CV, 2000 WL 682651, at *1 (Tenn. Ct. App. May 25, 2000), the trial court found that property transferred by quitclaim deed from Mr. Denton to Ms. Denton during their marriage was Ms. Denton's separate property. <u>See id.</u> The trial court was particularly influenced by the language of the quitclaim deed in making this determination. <u>See id.</u> On appeal, Mr. Denton argued that the execution of a quitclaim deed is not conclusive evidence of a gift. <u>See id.</u> at *2. The court of appeals affirmed the trial court's decision, relying on the parties' testimony on the issue, the language of the quitclaim deed, and the entire record. <u>See id.</u> at *3. Additionally, the court noted the importance of the fact that Ms. Denton made major decisions involving the property without Mr. Denton's involvement. <u>See id.</u> at *n4.

In <u>Dotson v. Dotson</u>, No. E1999-00135-COA-R3-CV, 2000 WL 688576, at *1 (Tenn. Ct. App. May 30, 2000), Mr. Dotson and Ms. Dotson executed a deed during their marriage conveying property to Ms. Dotson. <u>See id.</u> Mr. Dotson testified that the purpose of transferring the property to Ms. Dotson was to protect the property from Mr. Dotson's creditors. <u>See id.</u> at *3. The trial court classified the property as marital property. <u>See id.</u> at *1. The court of appeals affirmed, finding that Mr. Dotson did not intend to convey the property as a gift. <u>See id.</u> at *3. The court noted the importance of the trial court's opportunity to see and hear the parties testify on the issue so that the trial court could assess the parties' credibility. <u>See id.</u>

In both of these cases, the courts examined the language of the deeds, the testimony of the parties, and the entire record. In the case at hand, the trial court was not given an opportunity to examine the quitclaim deed.[8] The quitclaim deed has not been made a part of our record. The trial court failed to make a factual determination as to whether the office building was separate or marital property, and the record prevents us from conducting an independent review to ascertain the propriety of the trial court's decision to distribute the office building to Ms. Pennington as marital property. Accordingly, this issue must be remanded for further fact finding.

---

[8]In fact, Mr. Pennington stated at his deposition that the quitclaim deed was improperly made, and he questioned its legality.

## IV.  Conclusion

The judgment of the trial court awarding child support based on Mr. Pennington's potential income is reversed.  This case is remanded for a determination of child support based on Mr. Pennington's net income.  The judgment of the trial court awarding Ms. Pennington the office building as marital property is remanded for further findings of fact.  Costs of this appeal are taxed to the Appellee, Judy Diane Pennington, for which execution may issue if necessary.


_____
ALAN E. HIGHERS, JUDGE