# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### DECEMBER 12, 2007 Session

## MARY ANNE MARCIANTE v. WILLIAM HAROLD PERRY

**Direct Appeal from the Chancery Court for Williamson County**
**No. 32000     Russ Heldman, Chancellor**

---

**No. M2006-02654-COA-R3-CV - Filed March 26, 2008**

---

This appeal involves the classification and division of marital property after a marriage of approximately thirteen years.  We have determined that the trial court erred in its classification of various assets and debts, and the resulting distribution of the marital estate was inequitable.  Therefore, we modify the judgment and affirm as modified.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and JON KERRY BLACKWOOD, SR., J., joined.

Joanie L. Abernathy, Franklin, TN, for Appellant

Abby R. Rubenfeld, Nashville, TN, for Appellee

# OPINION

## I.  FACTS & PROCEDURAL HISTORY

William Harold Perry ("Husband") and Mary Anne Marciante ("Wife") married on December 29, 1992.  Husband was 40 years old at the time, and Wife was 36 years old.  This was Husband's second marriage, and he had two daughters from his first marriage.  Wife had never been married and had no children.  Husband and Wife did not have any children together, but Husband's youngest daughter came to live with them in 1998 when she was 14 years old.

Husband and Wife each owned several assets at the time of the marriage.  Each party already had a retirement plan: Husband's plan was worth approximately $44,000, and Wife's plan was worth approximately $66,000.  In addition, each party owned property in Florida.  Wife owned a condominium in Cape Canaveral, which the parties referred to as "Ocean Woods."  She had purchased the condo approximately nine years before the marriage for $64,000, paying $25,000 down and financing the balance through a mortgage.  Wife added Husband's name to the deed after they married, and Husband and Wife lived in the Ocean Woods condo for approximately eight months.  The parties then moved to Tennessee and rented the Ocean Woods condo to tenants whenever possible.  The mortgage on Ocean Woods was paid off in 2002, and the parties sold it in 2005 for $275,000.  Approximately $200,000 of the proceeds was used to pay off the mortgage on the parties' marital home in Franklin, Tennessee.

Husband owned four real properties in Florida when the parties married in 1992, but he did not add Wife's name to the deeds.  Husband owned a condo in St. Augustine, referred to as the "A1A condo," which was apparently unencumbered and worth approximately $70,000 when the parties married.  This condo was sold in 2002 for $152,000.  Husband also owned a condo in Titusville, Florida, called the "LaCita condo," which was worth about $70,000 at the time of the marriage, and he owned a condo in Jacksonville worth about $40,000.  These two condos were encumbered by mortgages and rented whenever possible.  Finally, Husband owned a one-half interest in an undeveloped parcel of property near Jacksonville, referred to as the "Mandarin" property.  It appears that this property was jointly owned with Husband's ex-wife, and his interest in the property was worth about $10,000 at the time he married Wife.

Husband and Wife are both licensed certified public accountants, but Husband earned significantly more money throughout the marriage.  From 1992 to 2002, Husband's yearly wages ranged from $62,948 to $144,705.  During those same years, Wife's wages increased from $31,884 to $66,266.

In 2002, Husband lost his job through no fault of his own, when his employer, Arthur Andersen, LLP, entered the process of dissolution.  According to Husband, he applied for various other jobs to no avail.  Husband then became involved in "day trading" or "cyber trading," but his trading business was never profitable.  However, Husband continued to receive investment income and retirement income while he was unemployed that exceeded Wife's yearly income.  Husband

went to Florida numerous times while he was unemployed to repair the parties' condos and refurbish them. In addition, Husband acted as "property manager" for the Ocean Woods condo from 2003 until it sold in 2005, locating prospective tenants and evicting tenants when necessary.

Wife filed for divorce on October 31, 2005, and Husband subsequently counterclaimed for divorce. In March of 2006, the parties were declared divorced pursuant to Tennessee Code Annotated section 36-4-129 upon stipulations that each party had grounds for divorce. The parties had no minor children, and neither party sought alimony. Thus, the only issue remaining for trial involved classifying and distributing the marital assets and debts. A bench trial was held on May 3, 2006, and on August 17, 2006, at which only the parties testified.[1] The parties agreed that each should be awarded his or her own vehicle and checking account, which they claimed were of comparable values. The following assets were at issue: the parties' marital home in Franklin, Tennessee, and its furnishings; the remaining properties in Florida; and the two retirement accounts. The parties also had a significant amount of credit card debt.

The parties gave very different accounts of their financial situation during the marriage. It is clear that each party had a separate checking account coming into the marriage, and each party added the other spouse's name to his or her checking account not long after the marriage. Husband and Wife had several credit card accounts in his or her own name, and they were both cardholders on one American Express account. In 1997, the parties opened a joint checking account and "pooled" their money, depositing their salaries into the joint account. In 2000, the joint checking account was closed, and the parties went back to using their other two checking accounts. At trial, the parties disputed the significance of closing the joint checking account and the extent to which they separated their finances thereafter.

According to Wife, she separated the parties' finances completely in 2000 because she was upset with how much money Husband was spending on his daughters. Both parties' names remained on both of the checking accounts, but generally, Wife used one and Husband used the other. Wife claimed that each party began paying for his or her own expenses, and if one spouse paid an expense that benefitted them both, the other would reimburse him or her for exactly one-half the expense. Both parties continued to use the joint American Express credit card account, but Wife claimed that each party was responsible for paying their own charges to the account and one-half of any charges that benefitted both of them. Husband, on the other hand, denied that any of the parties' finances – the checking accounts, credit cards, or expenses – were treated separately during any part of the marriage. He acknowledged that Wife would occasionally ask him to transfer money to the checking account that she "managed," but he insisted that neither party classified their expenses and asked for reimbursement. According to Husband, Wife never told him that he owed her any money for charges on their American Express account until just before she filed for divorce.

---

[1] We note that Husband became employed on May 15, 2006, while this case was pending in the trial court. He accepted a position in Alabama as a director of finance with an aerospace contractor, and at the time of trial, his annual salary was $125,000

The parties' debts totaled approximately $163,500. The credit cards in Wife's name had a combined balance of approximately $15,500, and she claimed that she owed her parents $10,000 for a loan related to this litigation. The credit cards in Husband's name had a combined balance of approximately $97,000. Husband testified that he spent approximately $45,000 of that amount on his daughters' college educations. The American Express credit card account, which both parties used, had a balance of about $41,000. Wife claimed that she had paid for more than her share of the American Express charges over the past few years, and Husband should be ordered to pay the entire American Express balance of $41,000.

The parties' marital home was unencumbered, as the mortgage had been paid off in 2005 with $200,000 from the sale of the Ocean Woods condo. Neither party disputed that the home was marital property. In addition, Husband had already moved out of the marital home and agreed that it should be awarded to Wife. The parties disputed the value of the home, however, and the amount that should be awarded to Husband in the equitable division of marital property. Wife claimed that the house was worth $362,500, and Husband testified that it was worth between $390,000 and $425,000.

Husband had removed most of his personal belongings from the home, but he claimed that the home furnishings that remained were marital property. He testified that the total value of the furnishings was between $20,000 and $22,000. Wife testified that the furnishings were worth $10,000.

Two of the Florida properties were sold during the marriage, but three were still owned at the time of the divorce: the "LaCita" condo, the Jacksonville condo, and the "Mandarin" property. All three of these properties were titled solely in Husband's name. The two condos were owned by Husband prior to the marriage, and the Mandarin property was the undeveloped parcel owned by Husband and his first wife. Both parties testified that they considered the properties to be Husband's separate property throughout the marriage. During the marriage, the three properties had greatly appreciated in value. Husband estimated that the value of the LaCita condo had increased from $70,000 to $150,000; the value of Jacksonville condo increased from $40,000 to $85,000; and the Mandarin property value increased from $10,000 to $15,000. Expenses for the LaCita condo and the Jacksonville condo, such as the mortgage payments, property taxes, condo maintenance fees, and utility payments, were paid from marital earnings, and the mortgages on both condos were paid off during the marriage. Husband also made significant improvements to the condos during the latter part of the marriage when he was unemployed. There was no testimony regarding a mortgage on or improvements to the Mandarin property.

The value of Wife's retirement plan[2] increased during the marriage from approximately $66,000 to $147,000. Husband's retirement plan was valued at $44,000 at the time of the marriage, and at one point during the marriage, Husband's retirement plan had increased in value to around

---

[2] The parties consistently referred to their "retirement" plans but did not explain what type of plan or account each party maintained.

-4-

$150,000. However, when Husband was unemployed between 2002 and 2005, he made withdrawals from his retirement plan totaling about $110,000. Husband testified that he used the money to pay for his daughters' college educations, to finance his day trading business, and to "supplement the short term." At the time of trial, Husband's retirement plan was only worth around $32,000.

After hearing the parties' testimony, the trial judge announced his ruling from the bench and later incorporated his statements into the final order. The judge first stated that he found Wife to be a believable witness. The judge adopted Wife's estimated value of the marital home, which was $362,500. Next, the judge found that the total increase in value of the three Florida properties, which was $130,000, was marital property subject to division. As for Wife's retirement account, the judge classified its $80,000 increase in value during the marriage as marital property. Regarding Husband's retirement account, the judge stated:

> Then I find that he is, he had these retirement accounts in a separate account, and it looks like $110,000 of that, which was marital property, was spent. For what he said was spent, on the witness stand, which I find – I find that did not benefit her.

Both parties interpret this statement as a classification of the $110,000 as marital property.

Before distributing the marital property, the judge stated that he had considered all of the relevant statutory factors in making his decision. He specifically noted his consideration of the fact that Wife's Ocean Woods condo was sold during the marriage, and $200,000 of the proceeds was used to pay off the mortgage on the marital home. He also noted that Husband still owned three Florida properties, and Husband had spent $110,000 of what would have been marital property during the marriage. The judge also stated that he was considering the fact that Wife had incurred $15,000 in attorney's fees, but rather than entering a judgment in her favor for that amount, he would take that debt into consideration when dividing the marital property.

The judge awarded the marital home, valued at $362,500, to Wife but ordered her to pay $38,757.66 to Husband for his "share of equity" in the home. The judge did not place a value on the furnishings in the home, but he stated that each party was to keep the personal property in his or her possession. The home furnishings were in Wife's possession. Husband was awarded the Florida properties, with $130,000 of their value representing marital property. Wife was awarded her retirement account valued at $147,000, which included $80,000 of marital property. Husband was awarded his retirement account currently valued at $32,000.

Regarding the debts, the trial judge first classified the $47,000 in credit card debt that Husband spent on his daughters' educations as his separate debts. As for marital debts, the judge ordered Husband to pay the $41,000 American Express joint credit card balance and all the balances on other cards issued in his individual name, which totaled an additional $50,000. Wife was ordered to pay the debts on credit cards issued in her name, which totaled $15,500, and the $10,000 loan to

her parents. In sum, Husband was ordered to pay $47,000 in "separate debts," and $91,000 in marital debts. Wife was ordered to pay $25,500 in marital debts.

Wife filed a motion to alter or amend the judgment, and two supplemental orders were entered that resolved issues not relevant to this appeal. Husband timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

On appeal, Husband contends that the trial court erred in classifying and dividing the parties' marital estate. Specifically, Husband challenges the trial court's classification of the increase in value of the Florida properties and his retirement account as marital property. Husband also contends that the overall result of the distribution was inequitable because he received a small portion of the assets and the majority of the debts. Finally, Husband contends that the trial court erred in deducting Wife's attorney's fees from his portion of the marital estate. Wife contends that the trial court's distribution of the marital estate was proper and should be affirmed.

We have determined that the trial court erred in its classification of certain assets and debts, and considering these errors, the overall distribution of marital property was inequitable.

## III. DISCUSSION

### A. Principles for Dividing a Marital Estate

"Dividing a marital estate necessarily begins with the systematic identification of all of the parties' property interests." *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007) (citing 19 W. Walton Garrett, *Tennessee Practice: Tennessee Divorce, Alimony and Child Custody* § 15:2, at 321 (rev. ed. 2004)). The next step is to classify all of those property interests as either marital or separate property. *Id.* (citing *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003); *Conley v. Conley*, 181 S.W.3d 692, 700 (Tenn. Ct. App. 2005); *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998)). Tennessee is a "dual property" state, and only property that fits within the statutory definition of "marital property" can be included in the marital estate to be divided. *Id.* Property classified as "separate property" should not be included in the marital estate. *Id.* After classifying the property, the court should place a reasonable value on each piece of property subject to division. *Davidson v. Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *2 (Tenn. Ct. App. Oct. 31, 2005); *Woods v. Woods*, No. M2002-01736-COA-R3-CV, 2005 WL 1651787, at *3 (Tenn. Ct. App. July 12, 2005). Once the marital property has been classified and valued, the trial court should equitably divide the marital property between the parties without regard to marital fault in proportions as the court deems just. Tenn. Code Ann. § 36-4-121(a)(1) (2005).

-6-

## B. *Identifying and Classifying the Marital Assets and Debts*

### 1. Husband's Retirement Account

The trial judge stated that the $110,000 increase in value of Husband's retirement account "was" marital property, but Husband had spent the money during the marriage on his daughters' college expenses and his day trading business. On appeal, both parties claim that the trial court classified the $110,000 as marital property and then awarded that amount to Husband as part of his marital share of the estate. In other words, when comparing the marital property that each party received, both parties list a $110,000 "award" of marital property to Husband, even though it was undisputed that this money no longer existed.

Whether property is classified as either marital or separate is a question of fact. **Dalton v. Dalton**, No. W2006-00118-COA-R3-CV, 2006 WL 3804415, at \*4 (Tenn. Ct. App. Dec. 28, 2006) (citing *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005)). A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2007); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).

Tennessee Code Annotated section 36-4-121(b) defines "marital property," in pertinent part, as follows:

> (1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and *owned by either or both spouses as of the date of filing of a complaint for divorce*, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, *and valued as of a date as near as reasonably possible to the final divorce hearing date*.
> (B) "Marital property" includes . . . the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

(emphasis added). It is clear from this statute that retirement benefits that accrued during the marriage are marital property under Tennessee law. **Langschmidt v. Langschmidt**, 81 S.W.3d 741, 749 (Tenn. 2002). However, "[t]he value of retirement benefits must be determined at a date as near

as possible to the date of the divorce." ***Cohen v. Cohen***, 937 S.W.2d 823, 830 (Tenn. 1996) (citing *Kendrick v. Kendrick*, 902 S.W.2d 918 (Tenn. Ct. App. 1994)).

The case of ***Davidson v. Davidson***, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *4 (Tenn. Ct. App. Oct. 31, 2005), involved an issue similar to the one before us. A husband and wife were married from 1993 to 2002, and their marital property was subject to division when they divorced. ***Id.*** The wife claimed that the "increase in value" of her husband's retirement benefits should be measured from the date of the marriage in 1993 to a certain date in 1996 when the retirement plan was at its peak value. ***Id.*** After that date, the value of the retirement plan decreased, as the husband began making monthly withdrawals to pay personal and marital expenses. ***Id.*** The Middle Section of this Court explained that marital property should be valued at the time of the divorce and stated, "in order to determine whether Mr. Davidson's retirement accounts increased in value during the marriage, we will compare the value at the time of the marriage and at the time of the divorce." ***Id.***

In this case, Husband's retirement plan was valued at $44,000 at the time of the marriage, and it was valued at $32,000 at the time of the divorce. Thus, the retirement plan did not increase in value during the marriage, and it did not constitute marital property to be divided. The trial court is only authorized to divide marital property that actually exists at the time of divorce, and "it cannot create assets that do not exist." ***Gratton v. Gratton***, No. M2004-01964-COA-R3-CV, 2006 WL 794883, at *8 (Tenn. Ct. App. Mar. 28, 2006) (citing Tenn. Code Ann. § 36-4-121(b)(1)(A); *Davidson*, 2005 WL 2860270, at *4)). Property that was once owned by a spouse, either as separate or marital property, but not owned at the time of divorce, is not subject to classification or distribution because a court cannot divide or distribute what is "not there." ***Brock v. Brock***, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996). Property not owned as of the date of the complaint for divorce does not fit within the definition of "marital property" and should not be divided as part of the marital estate. ***Flannary v. Flannary***, 121 S.W.3d 647, 650 (Tenn. 2003). Therefore, the $110,000 withdrawn from Husband's retirement account during the marriage should not have been included in the marital estate and "awarded" to Husband.

At oral argument, Wife's attorney stated that the trial court "specifically found that the Husband dissipated marital assets" in the amount of $110,000. There is no such finding in the final order, and after reading the entire record, we do not find a single reference to "dissipation" throughout the trial proceedings. The trial judge merely stated that Wife did not receive a benefit from the $110,000. This fact alone does not mean that Husband dissipated the asset. The parties testified that Husband used the $110,000 to pay for his daughters' college educations and to start his day trading business. The idea of dissipation is based on waste. ***Altman v. Altman***, 181 S.W.3d 676, 681 (Tenn. Ct. App. 2005). "Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down." ***Id.*** at 681-82. Dissipation generally occurs in contemplation of the dissolution of a marriage. ***Broadbent v. Broadbent***, 211 S.W.3d 216, 220 (Tenn. 2006). The timing of the allegedly improper or wasteful expenditure is extremely relevant, as "[i]t is unlikely that expenditures that were typical or commonplace during the marriage will

constitute dissipation, especially when the other spouse acquiesced in them." ***Altman***, 181 S.W.3d at 683, n.5.

Husband's use of the money to pay for his daughters' educations could hardly be considered dissipation in this case, especially in light of the fact that Wife testified she "had no problem with" Husband paying for his daughters' college expenses. In addition, Wife testified that the parties were not having marital problems when Husband started day trading. She thought that Husband was going to make money in day trading and "gave him a chance," expecting Husband to eventually contribute money from day trading to marital expenses. Husband ordered books and tapes and attempted to train himself for trading, but ultimately his trading business failed to yield a profit. It is important for courts to differentiate between dissipation and discretionary spending. ***Burden v. Burden***, No. E2006-01466-COA-R3-CV, 2007 WL 2790694, at \*17 (Tenn. Ct. App. Sept. 26, 2007) (citing *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at \*4 (Tenn. Ct. App. Aug. 24, 2004)). It is not for us to pass judgment on the wisdom of the parties' financial practices, and not all ill-advised expenditures are so wasteful and self-serving as to constitute dissipation. ***Id.*** "Simple mismanagement of family finances is not dissipation, nor is using marital funds to prop up a failing business." ***Altman***, 181 S.W.3d at 683. In ***Altman***, for example, a wife's continued use of marital funds to operate her unsuccessful consignment business did not constitute dissipation. ***Id.*** Dissipation involves intentional or purposeful conduct that has the effect of reducing the funds available for equitable distribution. ***Id.*** at 682. Husband started this business long before the parties began experiencing marital difficulties, and there is no indication that Husband engaged in day trading or otherwise wasted money for the purpose of depleting the marital estate.

In sum, Husband's $110,000 withdrawal from the retirement plan during the marriage was not part of the marital estate to be divided. In addition, the record does not support a finding of dissipation. However, when considering how to equitably divide the marital property that did exist, each party's contribution to the acquisition, preservation, appreciation, depreciation, or dissipation of the marital property is one of many factors to consider, which we will discuss hereinafter. *See* Tenn. Code Ann. § 36-4-121(c)(5) (2005).

### 2. The Increased Value of the Three Florida Properties

The trial court classified the increase in value of the three properties in Florida as marital property subject to division. During the parties' thirteen-year marriage, the LaCita condo had increased in value by $80,000 (from $70,000 to $150,000); the value of the Jacksonville condo increased by $45,000 (from $40,000 to $85,000); and the Mandarin property appreciated by $5,000 (from $10,000 to $15,000). All three of these properties were titled solely in Husband's name, and both parties testified that they considered them to be Husband's separate properties throughout the marriage. However, Tennessee Code Annotated section 36-4-121(b)(1)(B) provides that any increase in value during the marriage of property determined to be separate property is classified as marital property if each party substantially contributed to its preservation and appreciation. Thus, even if an asset is clearly separate property, the increase in the asset's value during the marriage may be considered marital property if the nonowner spouse contributed substantially to the asset's

preservation and appreciation. ***McFarland v. McFarland***, No. M2005-01260-COA-R3-CV, 2007 WL 2254576, at *4 (Tenn. Ct. App. Aug. 6, 2007) (citing Tenn. Code Ann. § 36-4-121(b)(1)(B); *Cohen v. Cohen*, 937 S.W.2d 823, 832-33 (Tenn. 1996); *Harrison v. Harrison*, 912 S.W.2d 124, 127 (Tenn. 1995)).

Whether a spouse made substantial contributions to the preservation and appreciation of separate property is a question of fact. ***Mitts v. Mitts*** 39 S.W.3d 142, 145 (Tenn. Ct. App. 2000) (citing *Sherrill v. Sherrill,* 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992)). In this case, the trial judge did not make a specific finding as to how Husband or Wife contributed to the appreciation or preservation of Husband's three properties. The judge simply stated his conclusion that the increase in value was marital property. A "substantial contribution" includes, but is not limited to, "the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine." Tenn. Code Ann. § 36-4-121(b)(1)(D) (2005). The statute requires a substantial contribution from both the husband and the wife to the preservation and appreciation of the property. ***Keyt v. Keyt***, – S.W.3d –, No. M2005-00447-SC-R11-CV, 2007 WL 4409712, at *6 (Tenn. Dec. 19, 2007). The contributions may be "direct or indirect," but they must satisfy two requirements: (1) the contributions must be "real and significant," and (2) "there must be some link between the spouses' contributions and the appreciation in the value of the separate property." *Id.* at *5. Stated differently, the real and significant contributions must have directly or indirectly caused the preservation and appreciation in the value of the separate property. *Id.* at *6. When separate property increases in value solely because of market factors, with no contribution from either spouse, the increase remains the separate property of the spouse who owns the property, no matter how great the other spouse's contribution to the marriage may have been. ***McFarland***, 2007 WL 2254576, at *7 (citing *Avery v. Avery*, No. M2000-00889-COA-R3-CV, 2001 WL 775604, at *10 (Tenn. Ct. App. July 11, 2001)).

In this case, Husband testified that throughout the marriage, he would go to Florida and work on the condos. Husband stated that while he was unemployed from 2002 to 2005, he "did a significant amount of condominium rehabilitation." Wife testified that one such trip in 2003 lasted three months because Husband was doing "damage repairs" on the condos. While Husband was in Florida improving the condos, Wife continued to work at her job in Tennessee and maintain the marital home. The supplies for the condo improvements and repairs were paid for with marital funds. The parties' marital earnings were also used to pay the mortgages[3] on the LaCita condo and the Jacksonville condo, and both mortgages were paid off during the marriage. In addition, marital

---

[3] From 1997 to 2000, these costs were paid from the parties' joint account where both parties' salaries were deposited. In the other years, the costs were paid from the checking account where Husband deposited his salary. Salaries of each spouse are marital property, ***Cohen v. Cohen***, 937 S.W.2d 823, 833 (Tenn. 1996), even if Wife's name was not on the bank account where they were deposited. ***Wade v. Wade***, 897 S.W.2d 702, 716 (Tenn. Ct. App. 1994).

It is not clear from the record how much Husband owed on the condo mortgages at the time of the marriage. Wife stated generally that Husband came into the marriage with a $23,000 mortgage and a $42,000 mortgage. It appears that these were the amounts owed on the two condos at issue because there was no discussion of mortgages on Husband's Mandarin property or A1A condo that we are aware of.

earnings were used to pay the condo maintenance fees each month, condo association dues, utility costs, and taxes.

The evidence in this case supports the trial court's implicit finding that both Husband and Wife made substantial contributions to the preservation and appreciation of the LaCita and Jacksonville condos. The expenses associated with preserving the condos were paid with marital earnings. Husband's significant efforts, both physical and financial, certainly improved the condos and added to their value. Although Wife did not physically perform the work on the condos, her continued employment in Tennessee and her maintenance of the marital home while Husband was gone were "real and significant," though indirect, contributions to the increased value in the properties. There was absolutely no testimony to suggest that the improvements made during the marriage did not contribute to the value of the two condos, or that the condos' values appreciated due to anything but the improvements, such as market forces or inflationary factors. Even if market forces had contributed to a portion of the appreciation, "any increase in value during the marriage" is marital property once it is shown that the parties substantially contributed to the property's preservation and appreciation. *Denton v. Denton*, 33 S.W.3d 229, 236 (Tenn. Ct. App. 2000) (quoting *Ellis v. Ellis*, 748 S.W.2d 424, 426-27 (Tenn. 1988)). "Substantial contributions are ones which are real and significant. They need not be monetarily commensurate with the appreciation in the property's value during the marriage." *Id.* (quoting *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 623 (Tenn. Ct. App. 1989)). Therefore, we conclude that the trial court properly classified the $80,000 increase in value of the LaCita condo and the $45,000 appreciation of the Jacksonville condo as marital property. We affirm the classification of this $125,000 as marital property.

Regarding the Mandarin property, however, we find that the evidence preponderates against a finding that both parties substantially contributed to its preservation and appreciation. The Mandarin property was an undeveloped parcel of property owned by Husband and his first wife, and there was no testimony regarding payments made on this property or any acts that would have contributed to its $5,000 appreciation. As such, the trial court erred in classifying this $5,000 as marital property subject to division.

### 3. The Debts

The trial court classified $47,000, representing two of the credit card balances, as Husband's separate debt, noting that it "was spent not on marriage, it was spent on basically the children." Husband testified that the money was spent on his daughters' college expenses. Marital debts are subject to equitable division in the same manner as marital property. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003) (citing *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)). "Marital debts" are "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Id.* Our Supreme Court has expressly rejected the notion that a debt must have produced a "joint benefit" for both parties in order to be classified as a marital debt. *See id.* Instead, the Court chose to adopt a bright line test that only requires us to consider whether the debt was incurred during the course of the marriage. *Id.*

It was undisputed in this case that the $47,000 credit card debt was incurred during the marriage; therefore, it was a marital debt to be divided as part of the marital estate. For purposes of classifying the debt, it is irrelevant that only Husband's name was listed on the account, and that he spent the money on his daughters.

### C. An Equitable Distribution of the Marital Estate

Once the parties' marital property has been classified and valued, the goal is to divide the marital property in an essentially equitable manner in proportions as the court deems just. Tenn. Code Ann. § 36-4-121(a)(1) (2005). "The division of marital property involves the distribution of both marital assets and marital debts." **Robertson v. Robertson**, 76 S.W.3d 337, 341 (Tenn. 2002). "The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." **Keyt v. Keyt**, – S.W.3d –, No. M2005-00447-SC-R11-CV, 2007 WL 4409712, at *4 (Tenn. Dec. 19, 2007). A court's division of marital property is not rendered inequitable simply because it is not precisely equal, or because each party did not receive a share of every piece of marital property. **Owens v. Owens**, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007). On appeal, it is not our role to tweak the manner in which a trial court has divided the marital property. *Id.* (citing *Morton v. Morton*, 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005)). "Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c)[4] is consistent with logic and reason, and whether the trial court's division of the marital property is equitable." *Id.* (citations omitted). The fairness of the trial court's distribution is inevitably reflected

---

[4] The factors include:

> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
> (10) The amount of social security benefits available to each spouse; and
> (11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (2005).

in its results.  *Id.* (citing *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005); *Bolin v. Bolin*, 99 S.W.3d 102, 107 (Tenn. Ct. App. 2002)).

After our re-classification of the withdrawal from Husband's retirement account and the appreciation of the Mandarin property, the marital property at issue in this case includes: the marital home, valued at $362,500; the increased value of Husband's two condos, valued at $125,000; the increased value of Wife's retirement account, which was $80,000; and the home furnishings, which the trial court did not value.[5]  Husband testified that the furnishings were worth between $20,000 and $22,000; Wife valued them at $10,000.   Because the trial court found that Wife was a believable witness and adopted her value of the marital home itself, we will use Wife's estimated value of the furnishings for purposes of this analysis.  Therefore, the total value of the marital assets at issue is $577,500.

The trial court awarded Wife the marital home, worth $362,500, but ordered her to pay Husband $38,757.66 for his marital share of the asset, for a net award to Wife of $323,742.34.  She also received the home furnishings, which she estimated were worth $10,000.  In addition, Wife was awarded her entire retirement account, which included $80,000 of marital property.  In sum, Wife received $413,742.34 of the marital property, or 72% of the marital assets.

As for Husband, the trial court first awarded him $38,757.66, representing his share of the marital home.  Husband also received his two condos in Florida, which represented $125,000 of marital property.  We have previously determined that the trial court erroneously credited Husband with $110,000 of marital property from his retirement account that no longer existed, and $5,000 of marital property from the appreciation of the undeveloped parcel of land, which should have been classified as Husband's separate property.  Overall, Husband received $163,757.66 in assets that were properly classified as marital property, or 28% of the marital assets.

Next, we must look to how the trial court distributed the marital debts.  A court's division of the marital estate is not complete until both the marital property and the marital debts have been allocated.  ***Owens v. Owens***  241 S.W.3d 478, 490 (Tenn. Ct. App. 2007)  (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002); *Hopkins v. Hopkins*, No. M2002-02233-COA-R3-CV, 2003 WL 21462971, at *6 (Tenn. Ct. App. June 25, 2003), *rev'd in part on other grounds*, 152 S.W.3d 447 (Tenn. 2004); *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998)). "Thus, an examination of the manner in which a trial court divided the marital property must take into consideration how the trial court allocated the marital debt."  *Id.*

There were $163,500 in debts at issue.  Wife was ordered to pay $15,500 in credit card debts in her name, along with a $10,000 loan from her parents.  Husband was ordered to pay $91,000 in credit card debts that were deemed "marital debts" by the trial court, and $47,000 in "separate debts." We have determined that these "separate debts" should have been classified as marital debts and

---

[5] As previously discussed, the parties agreed that each spouse should keep the checking accounts and vehicles in his or her name because they were of comparable value.

-13-

included in the marital estate. Therefore, Husband was actually ordered to pay $138,000 in marital debts, and Wife was ordered to pay $25,500 in marital debts. This resulted in Husband being responsible for 84% of the marital debts, and Wife paying 16%.

We agree with Husband's contention that the trial court's distribution of the marital estate was inequitable. At trial, Wife contended that Husband should only be awarded $18,757.66 from the $362,500 value of the marital home. Wife had calculated her proposed share by giving herself credit for amounts she contributed to the downpayment and mortgage on the home through loans from her parents and the sale of Ocean Woods. Even assuming *arguendo* that these were contributions of Wife's individual property,[6] they were commingled and transmuted when used to purchase the marital home, which was treated as marital property. *See McClellan v. McClellan*, 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993); *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988) (citing 2 H. Clark, *The Law of Domestic Relations in the United States* § 16.2, at 185 (1987)).

In addition, Wife reduced Husband's proposed share of the marital home by various "offsets" because she claimed that Husband owed her money. For example, Wife claimed Husband owed her $8,000 for his American Express charges that she had paid off over the past few years; $13,000 for his share of the household bills from 2003 to 2005; $10,000 of proceeds from the sale of the Ocean Woods condo that was deposited in Husband's checking account; and $9,000 of "fair market rental [value]" that she claimed Husband should pay her because he continued to live in the marital home after the mortgage was paid in full. The trial judge stated that he was "adopting [Wife's] numbers as to . . . how all this money has been spent." However, he also concluded that Wife should pay Husband more than just $18,757.66, so he simply added an additional $20,000 to Husband's proposed share in order to reach the $38,757.66 figure. We find that Wife's analysis regarding the division of this marital asset was erroneous and should not have been adopted or merely adjusted by the trial court. Wife has not cited any authority for her position that she is entitled to be reimbursed for the credit card charges and household expenses she paid, which were simply incurred and paid over the course of the marriage. In addition, there is nothing in the record to support her assertion that Husband should have been paying her rent to continue living in the marital home, and nothing to suggest that Husband wrongly deposited part of the Ocean Woods proceeds into his checking account.

When announcing his ruling, the trial judge aptly stated, "There was a lot of things that there was some concern about, he spent this on that and she spent this on that, and a lot of that just happens in a marriage. You just spend money." Unfortunately, however, the trial judge only slightly adjusted Wife's proposed figures, effectively deducting the claimed offsets from Husband's share of the marital estate. In doing so, the court did not distribute the estate in accordance with applicable legal standards, and more importantly, it did not achieve an equitable result.

_____

[6] It is not at all clear that these were contributions of Wife's separate property. Husband produced his credit card statements reflecting loan payments to Wife's parents. In addition, the parties lived in the Ocean Woods condo together, it was titled in both parties' names, and Husband performed extensive work on the condo.

Husband stated at trial that he was not asking the court to equally divide the marital property, acknowledging that he spent a large sum from his retirement savings on his daughters' educations and was unsuccessful at day trading. In addition, we have considered the fact that Husband still owned $125,000 worth of separate property from his condos and $32,000 from his retirement plan at the time of the divorce. Wife received $44,000 from her retirement plan as her separate property. Still, awarding Husband 28% of the marital assets ($163,757.66) and 84% of the marital debts ($138,000) was unreasonable under the circumstances. This was a thirteen-year marriage between parties of comparable age, health, and vocational skills. Although Husband incurred a great deal of financial obligations because of his daughters' college expenses, Husband also earned significantly more money during the first ten years of the marriage. In addition, Husband continued to receive other types of income when he was unemployed, and he also sold one of his condos during the marriage. Wife was awarded $413,742.34 in marital assets and only $25,500 in marital debts. Wife's allocation of marital debt included a $10,000 loan from her parents for litigation costs. The trial judge also stated that he was considering that Wife had incurred $15,000 in attorney's fees when he divided the marital property. Wife had estimated that her attorney's fees totaled only $18,000. None of Husband's attorney's fees, which totaled $22,000, were considered in the distribution of marital or separate debt.

At trial, Husband proposed that if Wife was awarded the marital home, he should be awarded $125,000 to $150,000 from the value of the marital home, the increase in Wife's retirement account, or a combination of the two.[7] Considering all the facts and circumstances of this case, we find that adjusting Husband's share of the marital home from $38,757.66 to $125,000 would result in an equitable distribution of the marital assets. The division of the marital assets, as modified, should be as follows:

### Awarded to Wife

| | |
|---|---|
| $237,500 | from the marital home ($362,500 – 125,000) |
| 10,000 | in furnishings |
| + 80,000 | in marital property from her retirement plan |
| $327,500 | |

### Awarded to Husband

| | |
|---|---|
| $125,000 | from the marital home |
| + 125,000 | in marital property from the Florida condos |
| $250,000 | |

---

[7] Specifically, Husband stated his opinion that it would be equitable to award him $125,000 to $150,000 if he was also allocated the entire $41,000 American Express credit card debt. We will discuss the American Express debt next.

On remand, the trial court should determine how and when this amount should be paid by Wife.[8] This distribution results in Wife being awarded 57% of the marital assets, and Husband being awarded 43% of the assets.

Now we turn to the allocation of marital debts. Both parties proposed that they should be allocated the credit card debts in his or her name. Husband's cards had a total balance of $97,000, and Wife's balances totaled $15,500. Wife also proposed that she be allocated the $10,000 loan from her parents. The only dispute concerned the $41,000 American Express credit card balance, as both parties were listed on that account. Husband claimed that it should all be assigned to Wife; and Wife claimed that it should all be assigned to Husband.

Tennessee courts should use four factors as guidelines in the equitable distribution of marital debt: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Alford v. Alford*, 120 S.W.3d 810, 814 (Tenn. 2003) (citing *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)). Both parties had been issued a credit card and incurred charges on the American Express account. Wife's account summaries from 2003 to 2005 reflected that she charged twice the amount that Husband charged each year. However, Wife claimed that many of her charges also benefitted Husband, and over the years, her payments totaled more than the charges that benefitted her.[9] Although both parties made payments on the account's balance, neither party's monthly contribution corresponded to the amounts he or she had charged. Some months Husband would pay nothing, sometimes Wife would pay nothing. Neither party made enough payments during 2004 or 2005 to cover their charges for the year, but Wife's summaries attributed all of the interest that accumulated in those years, which was over $8,000, to Husband. Wife is in a better position to repay the debt considering that Husband was allocated $97,000 in other debts, not including his attorney's fee costs, compared to Wife's $25,500.

Considering all these factors, we find it equitable to require each party to pay one-half of the $41,000 American Express credit card balance, or $20,500 each. Husband would then be responsible for a total of $117,500, or 72% of the marital debts, which we find to be equitable considering Husband's daughters' education costs. Wife would be allocated $46,000, or 28% of the marital debts. Overall, then, the division of property as adjusted awards $327,500 in marital assets and $46,000 in marital debts to Wife. Husband is awarded $250,000 in marital assets and $117,500 in debts.

---

[8] The trial court's previous order required Wife to have a mortgage lender send the sum of $38,757.66 directly to Husband as his share of the "equity" in the former marital home. The court may determine that this type of arrangement is sufficient, or it may enter a new order providing otherwise.

[9] At trial, Wife produced the American Express credit card statements for 2003, 2004, and 2005, and she had written beside every charge whether it benefitted Husband or Wife. Any charges that benefitted Husband's daughters were also assigned to Husband. For example, restaurant charges were either divided by two or divided by four, with Wife only being assigned a portion of the expense.

**IV. CONCLUSION**

For the aforementioned reasons, the trial court's final order is affirmed except as specifically modified herein, and this case is remanded to the trial court for further proceedings consistent with this opinion. Further, we decline to award attorney's fees on appeal. Costs of this appeal are taxed to the appellee, Mary Anne Marciante, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.